**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | } |
| | } |
| v. | }   Criminal Action No. H-08-428 |
| | } |
| ARISTILLE JOSEPH HARRIS. | } |

## OPINION AND ORDER

Presently before the Court is Defendant Aristille Joseph Harris' (Harris) motion to suppress evidence (Doc. 20).  The Court held an evidentiary hearing on this matter on December 16, 2008.  Upon review and consideration of the defendant's motion, the response and reply thereto, the evidence presented at the hearing, the supplemental briefs, and the relevant legal authority, the Court finds that the defendant's motion must be DENIED.

I.        Background and Relevant Facts

On August 8, 2007, the Texas City Police Department Special Crimes Unit (the TXCPD SCU) received a call from Deputy Christopher Dunn (Deputy Dunn) at the Galveston County Sheriff's Department about a confidential informant (CI) wishing to speak to them about narcotics trafficking.  (Hr'g Tr. at 9-10).  Three members of the TXCPD SCU, Officers Carlos Alcocer (Officer Alcocer), Allen Bjerke, Jr. (Officer Bjerke), and Donald Cox, Jr. (Officer Cox), subsequently met with Deputy Dunn and the CI.  (*Id.* at 10).  The TXCPD SCU officers and the CI then drove to the suspected narcotics trafficking location, The Breakers apartment complex in Texas City (the Breakers), to view the residence.  (*Id.* at 11).  The CI had informed the officer that the suspect, Harris, had violent tendencies, was extremely paranoid, and was known to carry a firearm on his person and in his residence.  (*Id.*).  Additionally, during drug transactions, Harris

would brandish weapons and conduct frequent surveillance out his window to see who was in the parking lot in case he was being watched. (*Id.* at 12). The CI, therefore, advised them not to stop the car in front of the apartment. (*Id.* at 13). The CI identified a second floor apartment with the front door facing north, a sliding glass door facing east, and a staircase leading up to the apartment that went in a westerly direction. (*Id.* at 13-14). The lighting inside the apartment alcove was dim, and, as such, the officers could not see the numbers above the apartment doors. (*Id.* at 14). After this drive-by, the officers and the CI returned to the TXCPD SCU office. (*Id.*).

Upon their return to TXCPD SCU office, Officers Bjerke and Cox prepared the CI for a controlled buy, while Officer Alcocer started work on the search warrant. (*Id.* at 15, 26). Officers Bjerke and Cox briefed the CI and then searched him and his vehicle to ensure that he did not have any narcotics or money. (*Id.* at 15). They also obtained cash to be used in the buy, documented the serial numbers on it, and gave it to the CI. (*Id.*). The CI then drove to The Breakers in his own vehicle with Officers Bjerke and Cox following behind him in an unmarked vehicle. (*Id.* at 16). The CI exited his vehicle, approached The Breakers and the suspect apartment, and then entered the apartment. (*Id.*). Shortly thereafter, he reappeared, proceeded back to his vehicle, and drove to the predetermined meet location to be debriefed by Officers Bjerke and Cox. (*Id.*). The CI advised the officers that he completed the transaction, and he then turned over the controlled substance to them. (*Id.* at 17). The officers subsequently searched him and released him from the scene. (*Id.*).

Before he left for the controlled buy, Officer Bjerke obtained a copy of a map of The Breakers to try to get a location of the apartment.[1] (*Id.* at 15). While on the scene of the controlled buy, Officer Bjerke looked at the apartment complex map and determined that the

---

[1] The TXCPD SCU has a binder with the layout maps of all of the apartment complexes within Texas City to assist the officers in locating apartment numbers when these numbers cannot visibly be seen. (*Id.* at 17-18).

apartment that was pointed out to him was number 163.  (*Id.* at 18).  He believed that this was the correct apartment number.  (*Id.*).  While Officers Bjerke and Cox were still on the scene, Officer Bjerke contacted Officer Alcocer via cellular telephone and advised him that, by looking at The Breakers map, he and Officer Cox believed the apartment number was 163.[2]  (*Id.*). Officer Alcocer, therefore, inserted this apartment number into the search warrant and affidavit. (*Id.* at 72).

Between 2:00 a.m. and 4:00 a.m. the following morning, Officers Cox, Bjerke, and Alcocer conducted a briefing for the SWAT team before the execution of the search warrant. (*Id.* at 40).  On an easel board, Officer Cox drew a diagram of the four apartments on the second floor and the stairwell used to access them.  (*Id.* at 41).  Because there was some uncertainty about the apartment number, Sergeant Rex Spotted Bear (Sergeant Spotted Bear) appointed Officer Alcocer to drive the SWAT team van to the building, lead the SWAT team to the apartment, and point out the exact apartment to them.  (*Id.* at 45).  Officer Alcocer escorted the SWAT team to the bottom of the stairwell and pointed to the exact door the team was to enter. (*Id.* at 75).  There was no question in Officer Alcocer's mind that the apartment he pointed to was the correct one.  (*Id.* at 76).  When the SWAT team initiated entry into the suspect apartment, Harris fired multiple gunshots from the inside of the apartment toward the front door. (*Id.* at 116).  It was not until after the raid that Officer Alcocer learned that the correct apartment number was 165.  (*Id.* at 76-77).

Harris was subsequently indicted on three counts: possession with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C);

---

[2] Officer Cox testified that while he and Officer Bjerke were at the controlled buy, they discussed the possibility that the apartment number that was indicated on the map may be incorrect.  (*Id.* at 44).  They discussed the possibility of physically moving to the alcove in order to confirm whether it was the correct number, but they decided not to because Harris conducted counter-surveillance.  (*Id.* at 44-45).

discharging a firearm during a drug trafficking crime in violation of 18 U.S.C § 924(c)(1)(A)(iii); and felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (Doc. 1).

II.        <u>Legal Standard on Suppression</u>

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the person or things to be seized."  U.S. Const. amend. IV.  "Evidence obtained in violation of the Fourth Amendment is to be excluded in a criminal proceeding against the victim of the violation."  *United States v. Cavazos*, 288 F.3d 706, 709 (5th Cir. 2002) (citing *United States v. Calandra*, 414 U.S. 338, 347 (1974); *United States v. Paige*, 136 F.3d 1012, 1017 (5th Cir. 1998); *United States v. Buchanan*, 70 F.3d 818 (5th Cir. 1996)).

"The Fourth Amendment's exclusionary rule will not bar the admission of evidence obtained with a warrant later found to be invalid so long as the executing officers acted in reasonable reliance on the warrant."  *United States v. Alvarez*, 127 F.3d 372, 373 (5th Cir. 1997) (citing *United States v. Leon*, 468 U.S. 897, 920 (1984)).  Suppression "cannot logically contribute to the deterrence of Fourth Amendment violations" if the officer executing the warrant acted upon an objectively reasonable belief that the warrant had been property issued.  *United States v. Gordon*, 901 F.2d 48, 50 (5th Cir. 1990) (quoting *Leon*, 468 U.S. at 919).

The *Leon* good-faith exception to the exclusionary rule does not apply if the warrant "was issued in reliance on an affiant's deliberate or reckless material misstatement."  *Alvarez*, 127 F.3d at 373 (citing *Leon*, 428 U.S. at 923).  If the defendant establishes by a preponderance an allegation of intentional falsity or reckless disregard for the truth, the court

"must then excise the offensive language from the affidavit and determine whether the remaining portion would have established the necessary probable cause." *Cavazos*, 288 F.3d at 710 (citing *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *Alvarez*, 127 F.3d at 374).  If the Court finds that the defendant did not meet his burden or that the affidavit would have sufficiently provided probable cause without the false information, it will conclude that the warrant does not violate the Fourth Amendment and, as such, the evidence need not be suppressed.  *Id.*

III.        Discussion

In the instant case, Defendant Harris argues that the Court should suppress the evidence seized during the search for two reasons.  First, Harris asserts that neither good faith nor reasonableness remedy the defects in the search warrant.  Second, Harris contends that the search warrant was issued based on material false statements under *Franks*.  The Government argues, however, that the good faith exception under *Leon* cures any deficiency in the search warrant and that the defendant has failed to establish a *Franks* violation.  For the reasons set forth below, the Court agrees with the Government.

Under the circumstances of this case, the Court concludes that the good faith exception to the exclusionary rule shall apply.  The facts in the instant case are analogous to those in *Gordon*, where the officer-affiant who mistakenly identified the premises accompanied the executing officers on the search and pointed out the proper location.  In *Gordon*, the Fifth Circuit relied on the Eleventh Circuit's decision in *United States v. Burke*, 784 F.2d 1090 (11th Cir. 1986), to uphold the validity of a warrant even though it contained an incorrect address because, *inter alia*, the affiant accompanied the executing officers on the search and was able to point out the proper location.  *Gordon*, 901 F.2d at 50 (citing *Burke*, 784 F.2d at 1093).

Subsequently, in *United States v. Smith*, 899 F.2d 1210 (5th Cir. 1993), the Fifth Circuit upheld the search of apartment 15-D where the search warrant specified apartment 15-C based upon incorrect information provided by the CI.  Before obtaining the search warrant, the officer-affiant took the CI to the general location of the apartment building, and the CI pointed out the defendant's apartment.  The CI identified the apartment as 15-C, but the officer-affiant was unable to verify the apartment number with absolute certainty.  Nevertheless, the officer-affiant obtained a search warrant and led the search team to the apartment the CI pointed out to him.  The Fifth Circuit found that, because the affiant and the executing officer were the same person, "there was no possibility the wrong premises would be searched."  *Id.* at 1210 (quoting *Gordon*, 901 F.2d at 50).  Additionally, the affiant had an objectively reasonable belief that the warrant had been property issued and comported with the Fourth Amendment.  *Id.* (citing *Leon*, 468 U.S. at 920-22).

In the instant case, the TXCPD SCU and SWAT team officers that executed the search warrant acted on an objectively reasonable belief that the warrant had been properly issued.  Officer Alcocer testified that Officer Bjerke told him the apartment number was 163 "to the best of his knowledge."  At the SWAT team briefing, there was, however, some degree of uncertainty about the exact apartment number.  To ensure that the correct premises would be searched, Sergeant Spotted Bear instructed Officer Alcocer to accompany the SWAT team to the foot of the stairwell and point out the exact apartment.  In *Gordon*, *Smith*, and *Burke*, the officer-affiant accompanied the executing officers on the search and pointed out the proper location. Just as the Fifth and Eleventh Circuits upheld the validity of the search warrants in those cases, the Court shall here.

With respect to his argument that the search warrant was issued based on material false statements and omissions under *Franks*, Defendant Harris alleges that the following five statements from the search warrant affidavit are untrue:

> The source stated that the suspects were engaging in the sale of crack cocaine at the residence known as 8801 Monticello Drive apartment #163, in the City of Texas City, Galveston County, Texas.

> Affiant followed the source's directions to the suspects' residence and found a residence that matched the description that the source gave Affiant, 8801 Monticello Drive apartment #163, in the City of Texas City, Galveston County, Texas.

> Upon arriving at the suspected location, the source was observed to make contact at the front door and observed entering apartment #163.

> After a short period of time the source was observed exiting apartment #163 and then leaving the apartment complex, followed by members of the Special Crimes Unit.

> Affiant further believes that a violation of the Texas Controlled Substances Act is currently taking place at 8801 Monticello Drive #163 in Texas City, Galveston County, Texas.

(Def.'s Ex. 5).  Defendant Harris further alleges that Officer Alcocer omitted from his search warrant affidavit these four key facts: that the lighting was bad, that Officer Bjerke got the apartment number from a map, that there was a doubt about the accuracy of the apartment number, and that Officer Alcocer was going to have to point out the apartment to the officers. Upon review and consideration of these statements and omissions, the testimony about them from the suppression hearing, and the search warrant affidavit as a whole, the Court finds that the defendant has failed to establish a *Franks* violation.

Officer Alcocer knew the physical location of the defendant's apartment because he was present during the initial drive-by with the CI.  None of the officers on the initial drive-by

could see the number above the defendant's apartment door because the lighting in the apartment alcove was dim.  Furthermore, they could not get close enough to see the apartment number because they were concerned for their safety.  The CI had advised them earlier that Harris had violent tendencies, was extremely paranoid, and was known to carry a firearm on his person and in his residence.

Officers Bjerke and Cox returned to The Breakers during the controlled buy operation, but for the same reasons they still could not see the apartment number above the defendant's door.  Officer Bjerke, therefore, referred to a map of The Breakers to determine the apartment number.  Both Officers Bjerke and Cox agreed that, to the best of their knowledge, the correct apartment number was 163.  Officer Bjerke then called Officer Alcocer to advise him of this, and Officer Alcocer consequently inserted apartment number 163 into his affidavit and the search warrant.  Officers Bjerke and Cox had, however, misread the apartment complex map and mistakenly provided the incorrect apartment number to Officer Alcocer.

There is no evidence that the officers in this case acted intentionally or with reckless disregard for the truth.  This case involves an error in the description of the place to be searched.  There is no evidence that Officer Alcocer or any of the other TXCPD SCU or SWAT team officers acted in bad faith or made material false statements that the magistrate relied upon in finding probable cause and granting the search warrant.  Defendant Harris has failed to meet his burden under *Franks*.  The Court, therefore, concludes that the search warrant does not violate the Fourth Amendment.

IV.      Conclusion

Accordingly, for the reasons set forth above, the Court hereby ORDERS that the defendant's motion to suppress evidence is DENIED.

- 8 -

SIGNED at Houston, Texas, this 16th day of March, 2009.

_____

MELINDA HARMON
UNITED STATES DISTRICT JUDGE